2024 IL App (1st) 231862-U

Order filed: August 29, 2024

FIRST DISTRICT
FOURTH DIVISION

No. 1-23-1862

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| JOHN GATTO, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | No. 2021 L 9887 |
| FRANKFURTRHEINMAIN CORP., | ) | |
| an Illinois Corporation, | ) | Honorable |
| | ) | Catherine A. Schneider, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We reversed the order granting summary judgment for defendant on plaintiff's complaint for breach of contract and remanded for further proceedings.

¶ 2    Plaintiff, John Gatto, appeals the circuit court's order granting summary judgment for defendant, FrankfurtRheinMain Corporation (FRM), on his complaint for breach of contract. Plaintiff contends that questions of material fact preclude the entry of summary judgment. We reverse and remand.

¶ 3    FRM is a wholly owned subsidiary of FrankfurtRheinMain, GmbH (FRM GmbH). FRM GmbH is the official government-funded agency promoting business development in the Frankfurt metropolitan region of Germany. FRM GmbH's core responsibilities are to attract international companies to the Frankfurt region and to facilitate the establishment and growth of its business operations. FRM GmbH operates with a fixed budget each year and allocates operating funds to each of its representative offices, including FRM as well as offices in London, Tokyo, Ho Chi Minh City, Shanghai, and Pune, India.

¶ 4    FRM handles FRM GmbH's promotion and marketing efforts in the United States and Canada.

¶ 5    Plaintiff has a Ph.D. from the University of Giessen in Germany and a *juris doctor* degree from the University of Wisconsin Law School. Plaintiff signed a written employment agreement (agreement) to become President of FRM effective January 1, 2018. The term of the agreement was for four years, until December 31, 2021. When plaintiff joined FRM, he was its only employee in the United States. Several months later, plaintiff hired Shannon Lynch to help him manage the Chicago office.

¶ 6    Section 2 of the agreement required plaintiff to prepare an annual budget, to be based on the "initial budget" and the mutually agreed goals and objectives of FRM. Plaintiff was required to present the annual budget to the "authorized representatives" of FRM GmbH.

¶ 7    Section 3 of the agreement provided for an initial budget of $500,000 for the year 2018 including all personnel, office and administrative costs. FRM GmbH was to provide those funds to FRM quarterly.

¶ 8    Section 8 provided that FRM would reimburse plaintiff for "all reasonable business travel and other out-of-pocket expenses reasonably incurred" in the performance of his duties. All

reimbursable expenses were to be "appropriately documented in reasonable detail" and submitted within 30 days of incurring those expenses.

¶ 9        Section 6(b) of the agreement allowed FRM to terminate plaintiff's employment for cause. Cause was defined as:

"(i) conviction of a crime involving moral turpitude;

(ii) willful misconduct or gross neglect of duties which, in either case, has resulted, or in all probability is likely to result, in damage to [FRM]; provided that within 30 days after receiving notice of such misconduct or neglect, on which [FRM GmbH] is relying to terminate you for cause, you shall have the opportunity to defend yourself before the authorized representatives of [FRM GmbH]; or

(iii) a repeated failure by you to follow the lawful written directives of [FRM GmbH] or any written policy of [FRM] which has resulted, or is likely to result, in material economic damage to [FRM]. In any such case, you shall be provided with [FRM GmbH's] written statement that it believes, in good faith, that such acts or failures to act by you are a violation of the Agreement and any relevant facts in support of such position. You, in turn, shall be afforded the opportunity to discuss the matter with the authorized representatives of [FRM GmbH] and the reasons for not complying with [FRM GmbH's] directives or [FRM] policy."

¶ 10        Section 6(b) further provided that if plaintiff was terminated for cause, all obligations to make any further payments under the agreement shall cease immediately, except for accrued, unused vacation pay and any accrued but unpaid salary up to the date of termination.

¶ 11        Section 6(c) allowed FRM to terminate plaintiff without cause, provided that it pay plaintiff the entire balance of the contract amount for the remaining term of the agreement.

¶ 12 FRM terminated plaintiff on December 11, 2020, ostensibly for cause. Plaintiff filed a complaint for breach of contract, alleging that he did not commit a crime involving moral turpitude, nor did he act with willful misconduct or gross negligence, or repeatedly fail to follow written directives, as required for a termination for cause. Therefore, plaintiff contended his termination was without cause, necessitating that FRM pay him the contract amount for the remaining term of the agreement. FRM's failure to pay him the monies owed him under the remaining term of the agreement constituted a breach of contract.

¶ 13 FRM filed a motion for summary judgment, noting that the essential elements of a breach of contract claim are (1) the existence of a valid and enforceable contract, (2) performance by plaintiff, (3) breach by defendant, and (4) resulting injury to plaintiff. See *Wolff v. Bethany North Suburban Group*, 2021 IL App (1st) 191858, ¶ 62. FRM argued that an "avalanche of evidence" showed both that plaintiff failed to perform under the agreement and that he committed acts supporting his termination for cause such that it was not required to pay him any further monies under the agreement. In support, FRM attached several affidavits.

¶ 14 Eric Menges attested that he is the President and Chief Executive Officer of FRM GmbH. Menges stated that plaintiff's job performance at FRM "was well below our expectations and disappointing in many respects." Menges terminated plaintiff for cause in 2020 "but only after [he] had disregarded many warnings and directives from [his principal supervisor Bertram Roth] and from me, and had failed to improve his performance and communication with us despite being given multiple opportunities to do so."

¶ 15 Menges gave specific examples of plaintiff's poor job performance. Menges explained that in 2019, plaintiff spent more than the monies allotted to him under the budget, necessitating the transfer of $55,000 from FRM GmbH to FRM in order to "keep the U.S. operations afloat."

Plaintiff had not informed Menges of the overspending or the necessity of an influx of cash to maintain FRM's viability; Menges heard of it from his accountant, Brad Stake of the accounting firm Andrea Luehmann, Ltd. (Luehmann). Menges emailed plaintiff on September 20, 2019, reminding him that as President of FRM he was responsible for managing and controlling the budget and expressing disappointment that plaintiff had not adequately informed Menges about the overspending. Menges informed plaintiff that going forward, all non-fixed costs had to be approved by either Roth or Menges. Menges directed plaintiff to work with Luehmann and to provide a detailed list of funds required for the remainder of the year.

¶ 16     Plaintiff sent an email on September 27 to Roth and to Sibylle Yaakov, the Vice President and Head of Global Marketing, noting that the payments FRM had received in the amount of $540,000 from FRM GmbH would be exhausted in the first half of October and that a budget bottleneck had unexpectedly occurred. Menges emailed plaintiff again, asking him to provide the information requested in the September 20 email.

¶ 17     Meanwhile, plaintiff was spending more in travel and entertainment expenses than any other employee while failing to provide sufficient documentation of those expenses. Menges sent plaintiff an email on November 11, 2019, stating that he was troubled by the lack of transparency in the expenses plaintiff was submitting. Menges gave plaintiff two weeks to provide sufficient documentation itemizing each of his food, beverage, and travel and entertainment expenses for which he was seeking reimbursement.

¶ 18     Plaintiff responded to the November 11 email by providing a generalized list of networking meetings. Menges sent plaintiff an email on November 23, 2019, informing him that his list was insufficient, and that he needed to provide specific details of his food, beverage, and travel and

entertainment expenses for the years 2018 and 2019. Menges requested that this information be provided by December 5, 2019.

¶ 19    On December 3, 2019, plaintiff informed Menges of the unlikelihood that he would be able to send the requested information by December 5.

¶ 20    Menges' concern with plaintiff's performance was so great that he flew from Frankfurt to Chicago in December 2019 to meet with him. During the December 2019 meeting, plaintiff agreed that he would email Menges some proposals on how to better manage FRM's annual budget by January 31, 2020.

¶ 21    Due to the budget shortfall caused by plaintiff's overspending, Menges made a second transfer of funds to FRM in the amount of $50,000 in November 2019 and a third transfer of funds, in the amount of 20,000 Euros, on January 2, 2020. Menges attested that these emergency transfers of funds prevented FRM GmbH from pursuing other objectives.

¶ 22    Menges sent plaintiff an email on January 31, 2020, instructing him to provide, no later than February 3, 2020, an explanation as to why he stayed longer in Germany than originally planned on three business trips. Plaintiff never responded to the January 31 email.

¶ 23    On February 17, 2020, Menges sent plaintiff another email seeking the budget proposals he had promised to send by January 31. Plaintiff failed to respond.

¶ 24    Later in 2020, Menges and Roth took steps to decouple plaintiff's credit card from FRM's bank accounts due to his continued failure to provide documentation justifying his food, beverage, and travel and entertainment expenses.

¶ 25    Menges attested to the numerous complaints he received about plaintiff from co-workers, service providers, and other individuals. For example, the accountants at Luehmann repeatedly complained about plaintiff's failure to provide required documentation.

¶ 26    As another example, Lynch sent Menges an email on September 19, 2019, complaining that plaintiff had failed to provide her with the health insurance and the funded 401(k) plan as promised to her when she was hired. Lynch also complained that plaintiff failed to give her any direction regarding her weekly tasks and that he made unacceptably lewd comments to her. At the end of 2019, Lynch submitted a notice of resignation, effective January 5, 2020.

¶ 27    On December 31, 2019, Menges emailed plaintiff about Lynch's upcoming departure and told him to make sure there were no loose ends with regard to her insurance and 401(k). However, Menges attested that despite this clear instruction, "at no time did [plaintiff] ever take care of Lynch's 401k issues." Instead, on January 31, 2020, an attorney representing Lynch sent Menges a letter threatening to file suit for fraud, breach of contract, and misrepresentation because Lynch still had not received the benefits owed her. As a result, FRM GmbH spent thousands of dollars to hire outside counsel and resolve the matter.

¶ 28    Other employees complained about plaintiff. For example, Roth sent Menges an email on February 26, 2020, discussing the substance of his phone call with Bruce Takefman of Research FDI, which is a lead generation company. Research FDI invoiced FRM for unpaid work it had performed. Roth relayed that during the phone call, Takefman said plaintiff was like a "ghost" who never responds to emails or phone calls.

¶ 29    On September 9, 2020, Menges received an email from Mark Tomkins, the President of the German American Chamber of Commerce of the Midwest (GACC), which leased office space to FRM. Tomkins complained of a lack of communication with plaintiff, compelling him not to renew the lease.

¶ 30    On December 11, 2020, Menges conducted a Zoom meeting with plaintiff in order to terminate his employment. During the conversation, Menges emailed plaintiff a spreadsheet

detailing the many ways his job performance had been unacceptable. Plaintiff acknowledged receiving the email with the attached spreadsheet, but stated that he could not open the document. Menges resent the spreadsheet, but plaintiff again stated he could not open it.

¶ 31    Menges orally informed plaintiff of the reasons supporting his termination, including his substantial budget overruns, and his failure to provide sufficient documentation of his food, beverage, and travel and entertainment expenses or to respond to repeated email requests for more information about budgets, expense reports, and business trip details.

¶ 32    Twenty minutes into the conversation, Menges emailed plaintiff a formal termination letter, stating that he was being terminated for cause under sections 6(b)(ii) and 6(b)(iii) of the agreement.

¶ 33    Bertram Roth attested in his affidavit that he is currently employed by FRM GmbH as the Director of Overseas Operations and Head of China Marketing. He supervised plaintiff during his employment with FRM. Roth stated that plaintiff overspent his 2019 budget, repeatedly failed to respond to requests from FRM's accountants for information necessary for budget preparations and for a planned audit of FRM's books for 2019, and failed to approve invoices so as to make payments to vendors. Plaintiff received an assessment of 0% on four of the six criteria in his 2019 performance evaluation.

¶ 34    Roth stated that plaintiff did not provide documentation supporting his credit card expenses ostensibly incurred on behalf of FRM. On April 3, 2020, Roth send plaintiff an email directing him to decouple his personal credit card from FRM's bank account. Plaintiff did not respond. Roth sent follow-up emails to which plaintiff also failed to respond. Therefore, Roth closed FRM's bank account and opened an entirely new bank account; plaintiff was not an authorized signer on this new account.

¶ 35    For all these reasons, Roth fully supported Menges' decision to terminate plaintiff for cause in 2020.

¶ 36    Brad Stake, an accountant at Luehmann, attested that he was responsible for managing FRM's financial accounts. Plaintiff repeatedly failed to provide Luehmann with information and documentation necessary to perform its accounting duties for FRM. Plaintiff's unresponsiveness often resulted in delayed expense reporting, unpaid invoices, delayed annual audits, and increased billable time spent by Luehmann on managing FRM's financial accounts.

¶ 37    Based on the affidavits of Menges, Roth, and Stake, FRM argued that plaintiff failed to perform under the agreement when he refused to: (1) manage and control FRM's budget; (2) ensure that Lynch receive her 401(k) benefits; (3) assist Luehmann with its accounting and audit-related tasks; (4) provide the required documentation of his food, beverage, and travel and entertainment expenses; and (5) decouple his credit card from FRM's bank account. FRM argued that this exact same evidence also showed that it did not breach the agreement by terminating plaintiff without paying him any further monies, because all of plaintiff's conduct described above supported his termination for cause. Accordingly, FRM argued that summary judgment should be granted in its favor on plaintiff's breach of contract claim.

¶ 38    Plaintiff filed a memorandum in opposition to FRM's motion for summary judgment. Plaintiff argued that summary judgment should be denied because there were material questions of fact regarding whether he substantially performed under the agreement or whether he committed acts justifying his termination for cause without paying him the balance of the contract amount.

¶ 39    Plaintiff filed a supporting affidavit, giving reasons for his allegedly poor job performance indicating that it was not the result of willful misconduct or gross neglect justifying his termination for cause. Specifically, plaintiff attested that the work email address assigned to him "often did not

work" and that throughout his tenure at FRM, he often was unable to receive or send emails, which helps to explain his intermittent communications with FRM. Plaintiff also stated that Lynch's failure to complete administrative tasks on a regular basis hampered his ability to complete his own job duties. Plaintiff's budgeting capabilities were further hampered by FRM's failure to provide him with a requested tracking tool to assist him in reviewing network expenses, fixed costs, and current funds. Plaintiff also disputed the assertion that he failed to timely approve the accountants' invoices and refused to decouple his credit card from the company bank account; he stated that he approved the invoices while speaking with Luehmann on the phone and that he decoupled the credit card at FRM's insistence.

¶ 40    Plaintiff provided an explanation for why he was unable to quickly provide all the requested information regarding his food, beverage, and travel and entertainment expenses. Plaintiff explained that when FRM first hired him, the guidelines relating to reimbursement of travel and entertainment expenses did not require details as to the dishes or drinks ordered. Suddenly, on November 11, 2019, Menges sent him an email advising him that he had two weeks to go through almost two years of expenses and provide more information related to meals, including: place and date, names of all attendees at the meals, and itemized bills from the restaurants specifying all food and beverage. Such a request required an extraordinary amount of effort, as plaintiff traveled extensively in 2018 and 2019 on behalf of FRM and needed to review and provide information on hundreds of receipts. Further, Lynch was providing plaintiff with no support at this point and would resign the following month. In addition, plaintiff was attempting to comply with mounting administrative tasks from FRM headquarters in Germany, while at the same time completing his core responsibilities of generating new business for FRM.

¶ 41    Plaintiff advised Menges and Roth of the above and he did his "best" to provide the requested information. On November 21, 2019, plaintiff provided a complete list of networking meetings he attended from December 14, 2018, through September 24, 2019, including the date, person, organization and purpose of the meeting.

¶ 42    With regard to his alleged failure to timely provide information for the 2019 audit, plaintiff attested that he provided such information to the best of his abilities, but certain documents requested by FRM were located in the Chicago office during the COVID-19 lockdown. Plaintiff resided outside Milwaukee and was unable to travel to Chicago during the lockdown to obtain those documents.

¶ 43    With regard to the failure to prepare the 2020 budget, plaintiff attested that the FRM budget depended greatly on attendance at various domestic and international conferences and with various partners and prospective partners. Due to COVID-19, these conferences were cancelled, and partners and prospective partners were not accepting meetings. Thus, FRM was not able to finalize a budget in 2020 due, in part, to the COVID-19 pandemic. Plaintiff also blamed the failure to finalize a 2020 budget on the refusal by Menges and Roth to provide commitments to the amount he could spend on travel, and on their failure to sign off on his hiring a new employee.

¶ 44    Plaintiff explained that the lessor refused to renew FRM's office lease because he became "disgruntled" with plaintiff's advocacy "against our office becoming a sub-tenant of the German Chamber of Commerce offices that he ran."

¶ 45    Plaintiff also explained that he was not at fault for failing to fund Lynch's 401(k) plan, as he had been under the impression that it was being properly administered by FRM's accountants.

¶ 46    As to the circumstances surrounding his termination, plaintiff attested that on December 11, 2020, Menges emailed him a termination letter and spoke with him about it in a "digital

conference." Menges attempted to send him an Excel chart detailing the reasons for the termination, but plaintiff was unable to open the document or review the chart. Plaintiff was not afforded the opportunity to review any written allegations against him or formulate a response prior to his termination.

¶ 47 Plaintiff gave a deposition that largely mirrored his affidavit. Plaintiff testified that to properly manage the budget, he reached out to the accounting firm at least quarterly, and often monthly, via phone and email to find out FRM's current position relating to finances, cash flow, and cash flow projections. Plaintiff had concerns that the accounting firm was not providing him information in a timely manner to assist with making cash projections and forecasts.

¶ 48 Plaintiff testified that he advised Menges in December 2019 that Lynch's poor job performance was a root cause for him being unable to provide the supporting documentation and expense reports in the fashion that FRM desired. Plaintiff denied making inappropriate or lewd comments to Lynch. Plaintiff believed all his business trips were sanctioned.

¶ 49 In his response to FRM's summary judgment motion, plaintiff also cited to a portion of Menges' deposition in which Menges admitted that in a conversation with Lynch, he stated that plaintiff's office was producing results so it was "hard *** to say [plaintiff] is not doing his job."

¶ 50 Plaintiff argued that the affidavits and deposition testimony raised questions of material fact as to whether he substantially performed under the agreement or whether he committed willful misconduct or gross neglect of duties or repeatedly failed to follow written directives justifying his termination for cause. Plaintiff also argued that the affidavits and deposition testimony raised a question of material fact as to whether FRM gave him the requisite notice and opportunity to defend himself as required under the agreement for a termination for cause.

¶ 51    The circuit court entered an order finding that "reasonable minds might differ as to whether Plaintiff performed under the contract" and stated that "the motion for summary judgment is denied on that basis."

¶ 52    The court never explicitly addressed whether plaintiff committed willful misconduct or gross negligence, or repeatedly failed to follow written directives, justifying his termination for cause. Nonetheless, the court turned to the issue of whether FRM gave plaintiff the requisite notice of his termination for cause and the opportunity to defend himself within 30 days as required by section 6(b)(ii) of the agreement. The court found that the spreadsheet provided to plaintiff constituted sufficient notice of the reasons for his termination and that he was given the opportunity to defend himself within 30 days of the notice. The court also found that FRM complied with section 6(b)(iii) by providing plaintiff with a termination letter setting forth how he had violated the agreement and by giving him the opportunity to discuss the matter during the Zoom call. The court stated, "[f]or this reason, the motion for summary judgment is granted."

¶ 53    Plaintiff appeals the grant of summary judgment in favor of FRM on his complaint for breach of contract based on FRM's compliance with the notice provisions set forth in sections 6(b)(ii) and 6(b)(iii) of the agreement for a termination for cause. Summary judgment is appropriate where the pleadings, depositions, admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, reveal that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Ledeaux v. Motorola Solutions, Inc.*, 2024 IL App (1st) 220886, ¶ 38. Review is *de novo*. *Id.*

¶ 54    Plaintiff argues that once the circuit court found a question of material fact regarding whether he substantially performed under the agreement, it should have denied FRM's motion for

summary judgment without ever reaching the issue of whether FRM complied with section 6(b)'s notice requirements. For the reasons that follow, we agree.

¶ 55    The issue of whether FRM gave plaintiff notice and the opportunity to defend only comes into play if FRM actually terminated him for cause; if the termination was without cause (as argued by plaintiff), no such notice and opportunity to defend was required under the agreement. Thus, pursuant to the agreement, the trier of fact first must decide whether plaintiff committed willful misconduct, gross neglect, or repeatedly failed to follow written directives sufficient to justify his termination for cause; if plaintiff committed such conduct, justifying his termination for cause, *only then* must the court decide whether FRM gave him sufficient notice and the timely opportunity to defend himself under the agreement. If the factfinder determines both that FRM terminated plaintiff for cause *and* gave him sufficient notice and the opportunity to defend himself, then his breach of contract action fails because he was owed no more monies.

¶ 56    However, if plaintiff did not commit willful misconduct or gross neglect, and did not repeatedly fail to follow written directives, then the termination was *without* cause and no written notice or opportunity to defend is afforded him under the agreement; FRM is required, though, to pay plaintiff the contract amount for the remaining term of the agreement and is in breach of contract if it fails to do so. To put it another way, plaintiff's breach of contract claim is not defeated by the circuit court's finding that FRM provided him notice and the opportunity to defend, *if* he never committed any acts justifying termination for cause in the first instance. The circuit court erred here by granting FRM's summary judgment motion on the basis that FRM provided plaintiff notice and an opportunity to defend, without first addressing whether plaintiff committed the acts necessary for a termination for cause or whether he was fired without cause. Therefore, we reverse the order granting FRM's motion for summary judgment and remand for further proceedings.

¶ 57    FRM next argues that we should affirm the summary judgment order on the basis that the "undisputed facts" show that plaintiff failed to substantially perform as required to maintain his breach of contract action. The circuit court did not rely on that basis when granting FRM's summary judgment motion. FRM cites *Mullins v. Evans*, 2021 IL App (1st) 191962, ¶ 25, which held that the appellate court may affirm the trial court's judgment on any basis in the record, regardless of whether the court relied on that basis or its reasoning was correct.

¶ 58    FRM's argument is without merit because it fails to recognize the conflicting evidence regarding whether plaintiff performed under the contract. FRM wants us to focus only on the affidavits filed by Menges, Roth, and Stake, who stated that plaintiff failed to substantially perform when he spent more than the monies allotted to him under the budget and failed to adequately document his food, beverage, and travel and entertainment expenses. Menges also stated that plaintiff's performance was sub-par due to the lewd comments he made to Lynch and his repeated failures to approve invoices and provide the financial information requested of him.

¶ 59    The affidavits filed by Menges, Roth, and Stake were contradicted by the affidavit and deposition testimony from plaintiff, who attested and testified to the reasonable performance of his job duties. Plaintiff attested and testified to his reasonable attempt to comply with FRM's sudden request to document two years' of his food, beverage, and travel and entertainment expenses, and denied that he made lewd comments to Lynch or failed to communicate with the accountants and timely approve invoices. Plaintiff discussed the work he did on the budget in 2019-2020, all while dealing with the general economic slowdown caused by the COVID-19 pandemic.

¶ 60    The conflicting affidavits and deposition testimony raise a question of material fact as to whether plaintiff substantially performed under the agreement. Accordingly, we reverse the order

granting summary judgment for FRM on plaintiff's breach of contract action and remand for further proceedings.

¶ 61    Reversed and remanded.